UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| ISAIAS GARCIA, | § | |
| | § | |
| *Plaintiff*, | § | |
| VS. | § | CIVIL ACTION NO. L-06-115 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of the | § | |
| Social Security Administration, | § | |
| *Defendant*. | § | |

## OPINION AND ORDER

Pending before the Court in the above-styled case are cross-motions for summary judgment. Plaintiff Isaias Garcia seeks judicial review of Defendant Commissioner of the Social Security Administration's (hereinafter "Commissioner") decision to deny his application for disability insurance benefits. The Court has evaluated the merits of both motions to determine whether substantial evidence supports Administrative Law Judge Gary L. Vanderhoof's (hereinafter "ALJ") conclusion that Garcia is not disabled within the meaning of the Social Security Act (hereinafter "the Act"). After careful consideration of the facts, pleadings, and governing law, the Court holds that the ALJ failed to apply the proper legal standards and that such error was harmful. Accordingly, the Court GRANTS Garcia's motion for judgment as to his request for a new hearing, DENIES Garcia's motion for judgment as to his request for benefits, DENIES the Commissioner's cross motion for summary judgment, VACATES the ALJ's decision, and REMANDS the cause for further consideration.

## I.   STATEMENT OF THE CASE

### A.   Course of Administrative Proceedings

Garcia applied for Social Security disability insurance benefits on July 11, 2003, claiming

that he suffers from lumbar discogenetic and degenerative disorders.  [Dkt. No. 13-2 at 11].  He sought benefits for a period beginning October 16, 1991.[1]  [*Id.* at 11, 26].  After evaluating Garcia's medical records, age, education, training, and work experience, the Social Security Administration (hereinafter "SSA") determined that Garcia did not qualify as disabled under the SSA rules and denied his claim on December 12, 2003.  [Dkt. No. 13-1 at 29-31].

On February 18, 2004, Garcia requested a hearing before an ALJ to dispute the denial of his claim.  [*Id.* at 33].  The hearing was held on November 14, 2005 in Laredo, Texas, before ALJ Vanderhoof, where attorney Jaime Pena represented Garcia.  [*See* Dkt. Nos. 13-2 at 5; 13-5 at 13].  Vocational expert Dr. Terry L. Vander-Molen testified as to Garcia's ability to perform other work given his condition.  [*See* Dkt. No. 13-1 at 38].  On December 2, 2005, the ALJ issued his decision, ruling that Garcia was not under a "disability," as defined in the Act, and found that he retained the residual functional capacity to perform a significant range of light work within the framework of Medical Vocational Rule 202.20.[2]  [*Id.* at 22-23].

On January 23, 2006, Garcia petitioned the Appeals Council to review the ALJ's December 2, 2005 decision.  [*See* Dkt. No. 13-1 at 11-12].  Garcia asserted that he is in fact disabled and "unable to engage in substantial, gainful employment."  The Appeals Council denied Garcia's request for review on June 16, 2006 because it found no reason under its rules to grant review.  [Dkt. No. 13-1 at 5].

On July 26, 2006, Garcia filed a civil action with this Court under Section 205(g) of the Act, 42 U.S.C. § 405(g) to obtain judicial review of the Commissioner's final decision denying

---

[1] On June 21, 1993, an ALJ awarded Garcia a closed period of disability beginning February 1992 through March 1993, when he returned to work.  [*See* Dkt. No. 13-1 at 16].  Benefits were subsequently terminated in May 1993.  [*Id.*].  Because Garcia worked at the substantial activity level through 2002, the onset disability date was amended to October 21, 2002.  [*Id.* at 16].

[2] The Medical Vocational Rules are located in 20 C.F.R. Part 404, Subpart P, Appendix 1, and provide a framework for evaluating the capability of an individual to engage in other work.

Garcia's claim for disability insurance benefits.  [Dkt. No. 1].  In his complaint, Garcia alleges that (1) the Commissioner's decision is not supported by substantial evidence, and (2) the Commissioner failed to apply proper legal standards to his claim.  [*Id.* at 2].  Garcia requested that this Court reverse and award benefits, or in the alternative, reverse and remand to the Commissioner for further proceedings.  [*Id.*].  The Commissioner answered that Garcia "has not shown that reversal or remand is warranted under section 205(g) of the [] Act, 42 U.S.C. § 405(g)."  [Dkt. No. 11, at 3].  On July 23, 2007, Garcia filed a summary judgment motion requesting the Court to reverse the Commissioner's finding of no disability.  [Dkt. No. 15].  The Commissioner filed a cross motion for summary judgment on August 8, 2007, arguing that sufficient evidence supports a finding of no disability.

### B.      Medical Condition and Evidence of Disability

Because the Court must determine whether the Commissioner's decision is supported by substantial evidence, a detailed summary of the evidence is set out herein.

### 1.      *Age, Education, and Work History*

Garcia was born on March 27, 1971 in Houston, Texas.  [Dkt. No. 13-5 at 17].  He was twenty years old on the date that he allegedly became disabled, thirty-two years old on the date his insured status expired, and thirty-four years old at the time of the hearing with the ALJ.  At the hearing, Garcia testified that he has a high school education and completed one year of college in 1991.  [Dkt. No. 13-5 at 18; *see also* Dkt. No. 13-2 at 30].  Garcia was married on April 26, 1996 and has two children.  [Dkt. Nos. 13-2 at 11, 13-5 at 17].

Garcia testified that his past employment experience includes:  meat packer, baker, machinist, transmission parts maker, cook,[3] and construction worker.  [*See* Dkt. No. 13-5 at 19-

---

[3] As a cook, Garcia was on his feet most of the day and was required to lift boxes weighing approximately 50 pounds.

22].  Garcia stated that he worked as a construction laborer from 1994 to 2002 for forty hours per week at a rate of $20.00 per hour.  [Dkt. No. 13-2 at 26].  Because of his large size, he was given the toughest jobs, which involved jackhammering roads, tying steel, and cleaning job sites.  [*Id.*; *see also* Dkt. Nos. 13-3 at 4-5; 13-5 at 8, 19-20].  Garcia claims that the heaviest weight he lifted was 100 pounds or more and that he frequently (i.e., from 1/3 to 2/3 of the workday) lifted fifty pounds or more.  [Dkt. No. 13-2 at 27].  At the hearing, Garcia testified that his job involved lifting steel forms and that the heaviest item that he lifted was 200 pounds.  [Dkt. No. 13-5 at 19-20].

### 2.    *Subjective Evidence*

Garcia stated in his disability application that he first became unable to work due to his condition on October 16, 1991.  [*Id.* at 11 & 26].  However, the record reflects that Garcia continued to work after this date and, in fact did not work fewer hours, change his job duties, or make any job-related changes.  [*Id.* at 26, 27].  Garcia eventually stopped working on October 20, 2002 because he was laid off.  [Dkt. No. 13-5 at 24].  He then drew unemployment benefits for approximately six months.[4]  [Dkt. No. 13-5 at 40].  Garcia testified at the hearing that he stopped working in October of 2004 because he was in too much pain and "couldn't do much bending."  [Dkt. No. 13-5 at 23; *see also* Dkt. No. 13-5 at 34 (stating that he is barely able to bend from the waist down and is unable to touch the floor)].

---

[4] In order to qualify for unemployment insurance, an applicant must meet certain ongoing availability and work requirements, such as, (1) making an active search for full-time work, unless exempted by the Texas Workforce Commission; (2) being physically able to work; (3) being available for full-time work; and (4) applying for and accepting suitable work.  Texas Workforce Commission, http://www.twc.state.tx.us/ui/bnfts/claimant1.html#qualify (last visited Sept. 18, 2007).  At the hearing, the ALJ questioned Garcia about the period during which he received unemployment benefits.  The ALJ correctly pointed out that if Garcia successfully drew unemployment benefits, he must have filled out the unemployment form each week, advising that, per the requirements for unemployment insurance, Garcia was willing and capable of performing some type of work.  [Dkt. No. 13-5 at 40].  When the ALJ asked Garcia what kind of work he could perform in 2003, Garcia responded "I'm not sure."  [Dkt. Nos. 13-5 at 40 to 13-6 at 1].

In his application, Garcia indicated that the injuries that limit his ability to work include a dislocated disk, a pinched nerve in his back, and injured knees. [Dkt. No. 13-2 at 25]. At the hearing, Garcia testified that he suffers from a left foot drop and from pain that radiates from the lower, right side of his back down to his right leg. [Dkt. No. 13-5 at 27]. The doctors have prescribed Talacen for his back pain, [*Id*. at 27], which he claims does not work, results in mood swings, and causes him to be nauseated. [*Id*. at 37-9]. These health problems allegedly render him unable to walk or sit for extended periods of time, cause numbness in his legs, and have resulted in paralysis in his lower right leg. [Dkt. No. 13-2 at 25].

A typical day for Garcia consists of taking a bath, eating breakfast, resting to avoid aggravating his injury, watching television, and taking his medication as prescribed daily. [Dkt. No.13-2 at 36, 38]. Garcia claims that he is unable to tie his shoes, is in pain when putting on his socks, and must sit down to put on his pants and underwear. [*Id*. at 37]. He states needing a chair to bathe and at times needs help getting up from the toilet. [Dkt. No. 13-5 at 31]. Garcia has no problem caring for his hair, shaving, or feeding himself. His wife cooks because he is unable to do so. His ability to concentrate while watching television is allegedly limited to fifteen or twenty minutes due to the pain in his back and because he needs to shift to a different position to ameliorate the pain. [Dkt. Nos. 13-2 at 37, 13-5 at 33].

Prior to the onset of this condition, Garcia was able to engage in certain activities which he is now allegedly unable to undertake, including: working, performing house chores, mowing the lawn, cleaning outside, washing his car, standing up and sitting down for long periods, or cooking. [*Id.*]. At the time Garcia filled out his application, he was able to leave the house on his own but only by car. [*Id*. at 38]. Nevertheless, at the hearing, he testified being unable to drive due to an inability to keep his foot on the gas or brake pedals. [Dkt. No. 13-5 at 32].

According to Garcia, his back pain interrupts his sleep every night, rendering him unable to sleep continuously for more than two or three hours before the pain bothers him, and forcing him to get up and shift positions before he gets comfortable again.  [*Id.* at 37].   Additionally, when he takes his medication he is able to "pretty much do okay" but that sometimes the medication does not work and at times he does not have it because he is unable to afford it.[5]  [*Id.* at 37-8].   Despite the little sleep he gets, Garcia testified that he does not sleep during the day because he has never liked to take naps.  [*Id.* at 38].  He also stated that while he is able to count change and handle a savings account, he has been unable to pay bills and use a checkbook or money orders since the onset of his condition and that his wife is now the one who runs the errands to pay the bills.  [Dkt. No. 13-2 at 39].

Garcia also testified being unable to lift anything around the house, including his son, who weighed twenty-five pounds at the time of the hearing.  [Dkt. No. 13-5 at 33].  Garcia claimed that the heaviest thing that he could lift were his boots, which he claims weighed about five pounds.  [*Id.*].  He never went to physical therapy because he could not afford it.  [*Id.*]. While he has had continuous problems with his shoulder, he continues to be able to write.  [*Id.* at 35].  Furthermore, he testified that the problems with his knee did not prevent him from doing construction labor work, that his back pain is the source of his inability to work, and that he believes surgery would improve his condition and enable him to return to work.  [*Id.* at 36-7].

When he filled out his application in July of 2003, Garcia stated being unable to lift anything over twenty pounds, stand for too long, walk for a long distance, sit for long periods, kneel down or squat, reach too high, and claimed being in pain when climbing stairs.  [Dkt. No. 13-2 at 40].  He also mentioned using a brace/splint but did not indicate needing crutches.  [*Id.*].

---

[5] Garcia stated that his insurance previously paid for his medication, but because he currently does not have insurance, he must pay for it out of his own pocket, which is expensive for him.  [Dkt. No. 13-5 at 38].

Garcia also alleges being able to walk a couple of blocks at a time but needing to rest for a few minutes before he can continue walking.  [Dkt. No. 13-3 at 1].  However, Garcia testified at the hearing that he uses a crutch and needs it all of the time in order for him to walk.  [Dkt. No. 13-5 at 30].  He also claims to use the crutch when he is not walking because he needs to support his weight while he shifts from one leg to another to tolerate the pain.  [*Id.*].  He also testified that the longest that he can stand in one place is thirty minutes, [*Id.* at 31], and that he is unable to do a sit-down job because of the intensity of pain in his back, even with medication.  [*Id.* at 39].

### 3.     *Medical History and Objective Medical Facts*

Garcia was 6-feet, 4-inches tall and weighed 295 pounds when he applied for disability insurance in July 2003.  [Dkt. No. 13-2 at 25].  He weighed approximately 270 pounds at the time of the hearing, [Dkt. No. 13-5 at 17-18], and testified to weighing 290 pounds in January of 2004 when his doctor told him to lose weight, [*Id.* at 39].  Garcia claims that he has tried losing weight but his inability to move around makes it difficult for him to do so.  [*Id.* at 40].

Garcia's medical records provide a long history of back pain but no actual diagnosis of spinal arachnoiditis, a lumbar disease that he references in his motion for summary judgment.  [*See* Dkt. Nos. 13-3 at 33 to 13-5 at 10, 15 at 6].  According to Garcia, he first sought medical care for a work-related back injury in 1991.  [*See* Dkt. No. 13-2 at 28].  On October 23, 1991, a magnetic resonance imaging (hereinafter "MRI") of Garcia's lumbar spine performed at the McAllen Medical Center revealed a herniated disc at L4-L5.[6]  [Dkt. No. 13-4 at 38].  Two years later, on January 6, 1993, Dr. Ariston Alfonso of the Mission Imaging Center, Inc. performed an MRI study of the lumbar spine and compared it with the October 23, 1991 study.  [*Id.* at 37].  Dr. Alfonso's report identified a previous lumbar laminectomy and diskectomy at L4-L5.  [*Id.*].  The

---

[6] This refers to lumbar vertebrae of the lower back numbers four and five.

comparison revealed that Garcia suffered from "post-surgical changes with epidural fibrosis at L4-L5", a "[n]arrowed disc space at L4-L5 with degeneration of the residual disc at the same level", and "[n]o recurrent disk herniation."  [*Id.*].   The following year, on March 22, 1994, Garcia underwent another MRI study of the lumbar spine.  [*Id.* at 36].   Comparison with the 1993 study revealed an "enhancing epidural fibrosus posterior to the disc at L4-L5 with associated mild deformity of the right anterior surface of the dural sac secondary to the adjacent epidural fibrosus."[7]  [*Id.*].   The comparison also revealed a focal calcified disk protrusion at L4-L5.   [*Id.*].   Dr. Alfonso noted that this should be closely watched because of the risk of progression into "frank disk herniation."  [*Id.*].

On January 26, 1995, another MRI study of the lumbar spine revealed enhanced epidural fibrosis and deformity of the right anterior surface of the dural sac at L4-L5.  [*Id.* at 35].   The study revealed no new disk herniations.  [*Id.*].   On January 18, 1999, a follow-up MRI of the lumbar spine revealed postsurgical diskectomy changes with granulation tissue formation and fibrotic scarring, and no evidence of recurrent disk herniation at L4-L5.  [*Id.* at 34].   However, the study revealed a new finding of disc herniation at L3-L4 and enhancement of posterior annulus fibrosus at that level.   Overall, the examining physician's impression was that there was no significant overall change when compared with the previous study.  [*Id.*].   On August 28, 2003, an MRI of the lumbar spine revealed no evidence of recurrent disc herniation at L4-L5. However, there was evidence of a slight disc herniation at L3-L4, but no overall change when compared with the January 18, 1999 study.  [*Id.* at 33].

On June 14, 2003, Dr. Dong H. Kim of the Oakwood Hospital and Medical Center in

---

[7] The dural sac is "[t]he membranous sac that encases the spinal cord within the bony structure of the vertebral column."  MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=40199 (last visited Sept. 18, 2008).

Dearborn, Michigan examined Garcia and concluded that both his vertebral alignment and the overall examination of the lumbosacral spine were normal. [Dkt. No. 13-4 at 1].

At the hearing, Garcia testified that Dr. Steven M. Rapp of the Michigan Spine Institute performed some exams on his back and two weeks later informed Garcia that he needed surgery. [Dkt. No. 13-5 at 25-26]. Garcia also testified that after moving to Texas from Michigan he visited Dr. Dihidon[8]—a physician who he had allegedly been seeing since his initial back injury—who also told Garcia that he needed surgery. [*Id.* at 26]. As of the present date, there is no evidence that Garcia has undergone the recommended procedure.[9] In his office notes dated June 17, 2003, Dr. Rapp noted that Garcia demonstrated a "decreased range of motion of the lumbar spine to flexion and extension" and decreased strength in the left foot. [Dkt. No. 13-4 at 8]. Additionally, Dr. Rapp's examinations of Garcia's sensory responses, deep tendon reflexes, peripheral nervous system, and coordination showed no abnormalities. [*Id.* at 8-9]. Having assessed that Garcia suffered from "lumbar disk herniation," Dr. Rapp recommended that Garcia "undergo a myelogram of the lumbar spine to further evaluate the cause of his current condition." [*Id.* at 9]. On July 10, 2003, Dr. Rapp issued a report after having personally reviewed Garcia's myelogram[10] and CT scan. [*Id.* at 6]. In his report, Dr. Rapp stated that there

---

[8] This is a phonetic spelling of the doctor's name as recorded in the hearing's transcript.

[9] Garcia underwent back surgery (i.e., a laminectomy) at L4-L5 on the right on October of 1992, approximately one year after his work injury. [Dkt. Nos. 13-4 at 35, 13-5 at 7-8]. Following surgery, Garcia reported that his symptoms did not improve. [Dkt. No. 13-5 at 7-8]. In his disability report, Garcia noted that he started taking two medications in 1992: (1) Chlorzoxazon (500 mg), a muscle relaxant; and (2) Talacen, a pain reliever. [Dkt. No. 13-3 at 25].

[10] Myelography is an x-ray technique used to study the spinal cord and its surrounding structures. The procedure involves the injection of radiopaque dye into the subarachnoid space (the space between the innermost and middle membranes surrounding the brain and spinal cord). The two main indications for myelography are suspected herniation of intervertebral disc material (a fibrocartilaginous pad interposed between adjacent vertebrae) and neoplasm (tumor). 2-19 COMMON DIAGNOSTIC PROCEDURES § 19.01, Matthew Bender & Company (2007). CT myelography has been found to be a more accurate diagnostic tool for arachnoiditis (inflammation of the arachnoid membrane, the membrane between the dura mater and pia mater of the brain and spinal cord) than an MRI scan. *Id.* at § 19.03.

was evidence of "a right paracentral and far lateral disk herniation at L4-L5," and recommended "a re-do lumbar laminectomy[11] for far lateral disk."  [*Id.*].  Dr. Rapp noted having informed Garcia of the risks involved with the surgery and stated notifying Garcia that "his pain may be the same or worse postoperatively."  [*Id.*].  Dr. Rapp indicated that Garcia was to contact him whenever he wished to have the surgery.  [*Id.*].

Garcia saw Dr. Tijerina numerous times beginning August 25, 2003 until August 31, 2005.  [*Id.* at 21-27, 29].  The reports for each visit indicate that Garcia complained of increased pain, discomfort, and a decrease in quality of sleep.  [*Id.*].  On September 10, 2003, Dr. Tijerina wrote a letter to the Texas Workers' Compensation Commission to summarize Garcia's condition and to outline his suggested treatment.  [*Id.* at 29-30].  Dr. Tijerina suggested that Garcia "decrease weight, increase walking," continue with the pain medication, and that he undergo an Electromyography (hereinafter "EMG")[12] and nerve conduction velocity study.  [*Id.* at 30; *see also id.* at 28].

Garcia's physical residual functional capacity assessment dated December 10, 2003 indicated the need for certain exertional limitations on activity for Garcia, including: occasionally lifting or carrying a maximum of twenty pounds; frequently lifting or carrying a maximum of ten pounds; standing and/or walking with normal breaks for a total of six hours in an eight-hour workday; sitting for a total of six hours in an eight-hour workday; and unlimited

---

[11] Lumbar laminectomy is a surgical procedure most often performed to treat leg pain related to herniated discs, spinal stenosis, and other related conditions.  The goal of a laminectomy is to relieve pressure on the spinal cord or spinal nerve by widening the spinal canal.  This is done by removing or trimming the lamina (roof) of the vertebrae to create more space for the nerves.    Vincent Traynelis, M.D., Lumbar Pain and Anatomy, http://www.spineuniverse.com/displayarticle.php/article545.html (last visited Sept. 10, 2007).

[12] Electromyography is a technique used for evaluating and recording physiologic properties of muscles at rest and while contracting and is used to determine whether weakness of a muscle is due to a nerve lesion or a defect of the muscle tissue.  Krarup, 1-11 COMMON DIAGNOSTIC PROCEDURES § 11.04, Matthew Bender & Company, Inc. (2007).

pushing and pulling.  [*Id.* at 14].   Other recommendations included postural limitations of occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  [*Id.* at 15].   No other limitations were established.

In January 2004, Garcia underwent shoulder surgery, [Dkt. No. 13-3 at 11], due to a problem that he suffered from since he was in high school, [Dkt. No. 13-5 at 34], thereby further limiting his mobility.   At the hearing, the ALJ noted that on October 20, 2004, Dr. Phillip Friedman issued a report and determined that "this individual will require continued work restrictions which include no lifting more than twenty pounds and he should be allowed positional changes."  [*See* Dkt. No. 13-6, at 2 (quoting Dkt. No. 13-5 at 9)].  On December 3, 2004, an MRI of the lumbar spine revealed enhanced disc herniation at L3-L4 and at L4-L5, as well as epidural fibrotic scarring at L4-L5 and on the margin of the L5 vertebral body.  [Dkt. No. 13-4, at 31].

On January 6, 2005, Dr. Ruy Mireless of the South Texas Neurological Center, P.A. evaluated the EMGs and velocity nerve conduction examinations (hereinafter "NCVs") that he performed on Garcia.  [*Id.* at 39].  Dr. Mireless concluded that "the EMGs examination revealed evidence of acute right S1 radiculopathy[13] and chronic reinnervation on muscles supplied by the right L5 nerve root."  [*Id.*].   Additionally, he noted that "the EMG performed on the left lower extremity revealed no radiculopathy" and that "the NCVs revealed an old left peroneal nerve palsy."[14]  [*Id.*].  In his report, Dr. Mireless's noted that the EMG "revealed decrease insertional activity of the left peroneus longus with polyphasic motor unit potentials and decrease

---

[13] Radiculopathy is defined as "any disease of the spinal nerve roots and spinal nerves" characterized by pain that radiates from the spine.  http://www.medterms.com/script/main/art.asp?articlekey=14161.

[14] Common peroneal nerve dysfunction is a disorder caused by damage to the peroneal nerve, characterized by loss of movement or sensation in the foot and leg.   Medline Plus, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000791.htm (last visited Sept. 12, 2007).

interference pattern."  [Dkt. No. 13-5 at 1].  The report also indicated that the EMG revealed increased insertional activity and fibrillations on the right hamstring, gastrosoleus, and buttocks with a decreased interference pattern compatible with right S1 acute radiculopathy, as well as decreased insertional activity in Garcia's anterior and posterior tibialis.  [*Id.*].

## II.    DISCUSSION

Garcia moves this Court for summary judgment based on the ALJ's alleged error in failing to (1) analyze whether his impairments met listing 1.04B;[15] and (2) obtain an updated medical expert opinion regarding meeting or equaling listing 1.04B.  [Dkt. No. 15].  In his cross motion for summary judgment, the Commissioner claims that substantial evidence supports the ALJ's decision denying Garcia disability benefits.  [Dkt. No. 16-1 at 1].  He argues that Garcia did not have an impairment that met or equaled a listing and that the evidence of record supports the ALJ's determination that Garcia is not disabled.  [Dkt. No. 17 at 3-7].  The Court will begin its analysis by setting out the summary judgment and applicable legal standards for judicial review of an ALJ's final judgment and will thereafter address the parties' motions.

### A.    Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Cross motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require the court to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.  *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st

---

[15] Disability insurance is governed by 20 C.F.R. Part 404, Subpart P.  If a claimant has an impairment that is listed in Subpart P, Appendix 1 or is equal to a listed impairment, there will be a finding of disability without considering other factors such as age, education, and work experience.  20 C.F.R. § 404.1520.  Listing 1.04B is "spinal arachnoiditis," one of the musculoskeletal impairments in Appendix 1 to Subpart P of 20 C.F.R. 404.

Cir. 1996).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record "which [the moving party] believes demonstrates the absence of a genuine issue of material fact" with respect to issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 327 (1986); *Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003).  The movant meets its initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.  If an adverse party completely fails to make a showing sufficient to establish an essential element of that party's case on which they will bear the burden of proof at trial, then all other facts are rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322-323.

## B.    Applicable Legal Standards for Judicial Review of an ALJ's Final Decision

Judicial review of the ALJ's final decision is limited to determining whether (1) substantial evidence supports the final decision; and (2) the ALJ used the proper legal standards to evaluate the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).  Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Ripley v. Chater*, 67 F.3d 552, 555 (5th

Cir. 1995) (internal quotations omitted); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  "It is more than a mere scintilla and less than a preponderance."  *Id.*  Substantial evidence must "do more than create a suspicion of the existence of the fact to be established, but a finding that there was 'no substantial evidence' will result only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Hames*, at 164 (citing *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973).

A district court must weigh four factors in determining whether substantial evidence of disability exists:  1) objective medical evidence; 2) diagnoses and opinions; 3) the claimant's subjective evidence of pain and disability;[16] and 4) the claimant's age, education, and work history.  *When v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  Using these evidentiary sources as guidelines, the district court must review the entire record to determine whether it contains substantial evidence to support the ALJ's decision.  However, the district court may not reweigh the evidence in the record, try the issues de novo, or substitute its own judgment for that of the ALJ's.  *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Brown*, 192 F.3d at 496.  This is so even if the evidence weighs against the Commissioner's decision.  *Brown*, 192 F.3d at 496.  If substantial evidence supports the ALJ's findings, then those findings are conclusive and the Commissioner's decision must be affirmed.  42 U.S.C. § 405(g); *Martinez*, 64 F.3d at 173; *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  A district court may only reverse the Commissioner's final determination of disability if the ALJ did not apply the proper legal

---

[16] The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he "must establish a medically determinable impairment that is capable of producing disabling pain." *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). "Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity." *See id.* (citing 20 C.F.R. § 404.1529).

standards or the record did not contain substantial evidence to support his decision.  § 405(g) (2000).

### C.    Issues for this Court and Summary Judgment Motions

There are two primary issues for the Court to resolve in this case:  (1) whether the ALJ applied the proper legal standards to Garcia's claim; and (2) whether substantial evidence supports the ALJ's decision that Garcia is not disabled within the meaning of the Act.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  The Court will first set out the relevant standard for entitlement to social security benefits and the five-step sequential evaluation that an ALJ must use to evaluate a disability claim.  Then, the Court will analyze the ALJ's findings and determine whether substantial evidence supports his conclusions.

#### *1.    Standard for Entitlement to Social Security Benefits*

The Act defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A).  "Substantial gainful activity is work that is both substantial and gainful."  20 C.F.R. § 404.1572.  "Substantial work activity is work activity that involves doing significant physical or mental activities." §404.1572(a).  Work may be substantial even if it is done on a part-time basis or if performed in lesser amount, with lesser compensation or with lesser responsibility than the work previously performed.  *Id.*  "Gainful work activity is work activity done for pay or profit," regardless of whether a profit was realized.  § 404.1572(b).

To qualify for disability benefits, the SSA requires that a person's health problems must (1) keep the person from doing any kind of substantial work; and (2) last, or be expected to last,

for at least 12 months in a row, or result in death.  [*See* Notice of Disapproved Claim, Dkt. No. 13-1, at 30].  In deciding whether a person has the ability to work at the substantial gainful activity level, the SSA considers whether a person's duties require use of his "experience, skills, supervision, and responsibilities."  20 C.F.R. § 404.1573(a).  The SSA also considers a person's level of performance.  § 404.1573(b).  Satisfactory work performance may demonstrate that a person is working at the substantial gainful activity level.  *Id.*  However, inability to satisfactorily perform ordinary or simple tasks because of a person's impairments "without more supervision or assistance than is usually given other people doing similar work" may show that a person is not working at the substantial gainful activity level.  *Id.*

### 2.    *Five-Step Evaluation*

In evaluating a disability claim, an ALJ must use the five-step sequential evaluation pursuant to 20 C.F.R. § 404.1520.  [Dkt. No. 13-1 at 17].  A conclusive finding at any step makes it unnecessary for the ALJ to proceed to the subsequent steps.  § 404.1520(a)(4).  Under the first step, the ALJ determines whether the claimant is engaged in "substantial gainful activity."   If the claimant is engaged in such activity, disability benefits are denied.  §§ 404.1520(a)(4)(i), (b); 416.920(b).  If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two to determine whether the claimant has a medically severe impairment or combination thereof.  § 404.1520(a)(4)(ii).  The "severity regulation" at issue in the case governs that determination.  *See* § 404.1520(c).  The severity regulation provides: "if you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities,[17] we will find that you do not have a severe

---

[17] The ability to do "basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." § 404.1521(b).  Such abilities and aptitudes include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "capacities for seeing, hearing, and speaking"; "understanding, carrying out, and remembering simple instructions"; "use of judgment"; "responding appropriately to supervision,

impairment and are, therefore, not disabled." §§ 404.1520(c), 416.920(c). A claimant's age, education, and work experience is not taken into consideration at this stage.[18] §§ 404.1520(c), 416.920(c). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, the disability claim will be denied. If the impairment is severe, the ALJ will proceed to the third step, in which he determines whether the impairment meets or is equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, of the Regulations. §§ 404.1520(a)(4)(iii), (d); 416.920(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If the claimant's impairment does not meet or equal a listing, the ALJ then proceeds to the fourth step, in which he makes a determination about the claimant's residual functional capacity and past relevant work. § 404.1520(a)(4)(iv), (d). The Regulations define the term "residual functional capacity" as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. 20 C.F.R. § 404.1545(a); Soc. Sec. Ruling (SSR) 96-8p, West's Soc. Sec. Reporting Serv. Rulings 131 (Supp. 2006). If the claimant is able to perform his past relevant work, then he is not disabled. § 404.1520(a)(4)(iv), (d). If the claimant cannot perform his past work, then the ALJ will proceed to the fifth step to determine whether the claimant is able to make an adjustment to other work considering his age, education, and work experience. § 404.1520(a)(4)(v), (g). If the claimant is not able to perform other work that accommodates his residual functional capacity and vocational factors, then he will be entitled to disability benefits. §§ 404.1520(g), 416.920(g).

---

co-workers, and usual work situations"; and "dealing with changes in a routine work setting." *Ibid*.

[18] The severity regulation additionally states that "it is possible for [a claimant] to have a period of disability in the past even [if he does not] now have a severe impairment. *Id*.

### 3.   *Burden of Proof*

As the claimant, Garcia bears the burden of proving that he is disabled—"that is, unable to engage in any substantial gainful activity, and that his disability has lasted or may be expected to last twelve months." *Taylor v. Bowen*, 782 F.2d 1294, 1297-98 (5th Cir. 1986)).  Garcia has the initial burden of demonstrating (1) an inability to perform his previous work, § 404.1512(a); (2) an inability to engage in substantial employment; and (3) that his impairment meets the duration requirement.  *Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987).  If the claimant meets the burden associated with steps one through four, the burden then shifts to the Commissioner to show that the claimant is able to engage in some type of alternative work (the fifth step).  *Chaparro*, 815 F.2d at 1010; *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995).  Despite the claimant's burden, the ALJ must consider all of the claimant's symptoms, including subjective complaints of pain, as it is improper not to consider these complaints if the claimant would be entitled to benefits were his allegations believed.[19]  *Scharlow v. Schwelker*, 655 F.2d 645, 648 (5th Cir. 1981) (reversing and remanding because ALJ made no findings as to claimant's subjective complaints of pain).  Moreover, failure to consider a claimant's testimony of subjective evidence of pain and disability is reversible error.  *Id.*  Nevertheless, the ALJ must also consider the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence in the record and other evidence.[20]  20 C.F.R. § 404.1529(a); SSR 96-7p.  The ALJ must also consider medical opinions—judgments about the nature and severity of the impairments and resulting limitations.  20 C.F.R. § 404.1527(a)(2); SSR 96-2p & 96-6p.

---

[19] "It is well established in the Fifth Circuit that pain alone can be disabling, even when its existence is unsupported by objective medical evidence if linked to a medically determinable impairment."  *See Scharlow*, 655 F.2d at 648.

[20] "Objective medical evidence" includes medical signs and laboratory findings as defined in § 404.1528(b) & (c). § 404.1529(a).  "Other evidence includes statements or reports about claimant's "medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [claimant's] impairments and any related symptoms affect [his] ability to work.  *Id.*

### 4.     ALJ Vanderhoof's Findings

After reviewing all of the evidence as applied to the five-step sequential evaluation process, the ALJ found that Garcia was not "disabled," as defined in the Act.  [Dkt. No. 13-1 at 23].  In particular, he found that Garcia's impairment was not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, and that he retains the residual functional capacity to perform other work.  [*Id.* at 19, 23].  The ALJ's specific findings are as follow:

Under the first step of the analysis, the ALJ must ascertain whether the claimant is engaged in substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i), (b); 20 C.F.R. § 416.920(b).  If so, the claim will be denied.  § 404.1520(a)(4)(i).  Finding that Garcia has not engaged in substantial gainful activity since October 21, 2002, [Dkt. No. 13-1 at 23], the ALJ proceeded to the

second step.

In the second step, the ALJ must determine whether the claimed impairment(s) is "severe," that is, of a magnitude sufficient to limit significantly the individual's ability to perform basic work activities.  *See* §§ 404.1520(a)(4)(ii), (c); 416.920(c).  If it is not, the claim will be denied. § 404.1520(a)(4)(ii).  After reviewing Garcia's medical records and evaluating his testimony, the ALJ found that Garcia's "herniated lumbar L5-S1 disc and postop laminectomy with discectomy at the L4-5 level are considered 'severe' based on the requirements in . . . 20 C.F.R. § 404.1520(c)."  [Dkt. No. 13-1 at 23].  Consequently, he proceeded to the third step, where the ALJ must decide whether the impairment meets or is equivalent to one of the listed impairments in Appendix 1 of the Regulations. §§ 404.1520(a)(4)(iii), (d); 416.920(d); *see* 20 C.F.R. pt. 404, subpt. P, App. 1.  If it does, the

claimant is automatically awarded disability benefits.  § 404.1520(a)(4)(iii), (d).  At this step the ALJ found that Garcia's impairments did not meet or medically equal . . . one of the listed impairments in Appendix 1, [Dkt. No. 13-1 at 23], and summarily concluded that "[t]he medical evidence indicates that the claimant has status post lumbar laminectomy, cervical disc herniation, headaches and chronic neck and back pain, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  [*Id.* at 19].

If the claimant's impairment fails to meet or equal a listed impairment, the ALJ must proceed to the fourth step, where he must determine whether the claimant "has the residual functional capacity to perform the requirements of his past relevant work."  § 404.1520(e).  If the ALJ finds that the claimant has this capacity, the claimant will not be found disabled and his claim will be denied.  *Id.*  At this point, the ALJ determined that Garcia did not have the capacity to perform any of his past relevant work.  [Dkt. No. 13-1 at 23].

If the ALJ determines that the claimant cannot perform his past work, he will then proceed to the fifth and final step to adjudicate whether the claimant can adjust to other work. § 404.1520(a)(4)(v), (e).  In making this determination the ALJ will consider the claimant's age, education, and work experience. § 404.1520(a)(4)(v).  The claimant will be entitled to disability benefits if the ALJ finds that he is not able to perform other work that accommodates his residual functional capacity and vocational factors.  §§ 404.1520(f), 416.920(f).  Here, the ALJ found that Garcia is a "younger individual between the ages of 18 and 44"; has "more than a high school . . . education"; and has the residual functional capacity to perform a significant range of light work.  [Dkt. No. 13-1 at 23-24].  Additionally, he determined that Garcia's residual functional capacity includes the following:  occasionally lifting and carrying twenty pounds and ten pounds

on a frequent basis; standing and/or walking six hours in an eight-hour workday; sitting six hours in an eight-hour workday with breaks; occasionally climbing stairs and ramps, stooping, kneeling, crouching, and crawling.  The ALJ additionally found that Garcia cannot climb ladders, ropes, or scaffolds and has a limited ability to balance.  Furthermore, he pointed out that Garcia wears a knee brace and cannot work at unprotected heights, but found that he can perform routine repetitive work.  [*Id.* at 23].

Having determined that Garcia has the residual functional capacity to perform a significant range of light work, and relying on the vocational expert's testimony, the ALJ found that Garcia is capable of performing a number of jobs in the national economy according to Medical-Vocational Rule 202.20.  [Dkt. No. 13-1 at 23-4].  Consequently, the ALJ concluded that Garcia is "not disabled."  [*Id.* at 22].

### 5.    *ALJ Vanderhoof's Conclusion that Garcia's Impairment(s) neither Met nor Equaled a Listing*

Because the ALJ found in favor of Garcia in the first two steps of the analysis, the Court will proceed directly to step three, in which he found that Garcia's impairments do not meet or medically equal one of the listed impairments in Appendix 1.  [Dkt. No. 13-1 at 23].

### a.    **ALJ Vanderhoof Failed to Apply Proper Legal Standards**

Garcia argues that the ALJ did not apply the proper legal standards in his determination at step three.  Specifically, Garcia complains that the ALJ's "analysis of whether Garcia's impairments satisfy the criteria of *any* Listing is limited to one sentence that summarily states that Garcia's impairments are 'not severe enough to meet or medically equal any of the listings.'"  [Dkt. No. 15 at 6].  Furthermore, Garcia points out that the ALJ failed to refer to Listing 1.04B or offer any analysis explaining which of the criteria in the listing were not accounted for in the medical record.  [*Id.*].

As stated above, if a claimant "has an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s)," the claimant will be found to be disabled without considering age, education, and work experience. § 404.1520(d).   In making his decision, the ALJ must consider all of claimant's symptoms, *Scharlow*, 655 F.2d at 648; medical opinions, 20 C.F.R. § 404.1527; and Social Security Rulings 96-2p & 96-6p.   The Act requires that the Commissioner state the reason(s) upon which an adverse determination is made:

> [t]he Commissioner of Social Security is directed to make any findings of fact, and decisions as to the rights of any individual applying for a payment under this [subchapter.]   Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C. § 405(b)(1).   Under this statute, the ALJ was required to discuss the evidence in the record supporting Garcia's claim for disability, and to explain why he found Garcia not to be disabled at step three of the analysis.   *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). While an ALJ is not always bound to meticulously discuss his rationale, he must "minimally articulate his reasons for crediting or rejecting evidence of disability," *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988), and must state the reasons for his conclusions in a manner sufficient to permit an informed review, *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1998). The Fifth Circuit imposes a duty on an ALJ "to develop the facts fully and fairly relating to an applicant's claim for disability benefits."   *See Ripley*, 67 F.3d at 557.   "If the ALJ does not satisfy his duty, his decision is not substantially justified."   *Id.*

The Court agrees with the Commissioner that the body of the ALJ's decision discussed the medical history of Garcia's back condition.   However, in his report, the ALJ summarily

stated that Garcia's impairments were not "severe" enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4." [Dkt. No. 13-1 at 19].  The Court does not believe that his analysis "establishes that Plaintiff did not satisfy Listing 1.04B."  [*See* Dkt. No. 17 at 6].  Rather, by setting forth his determination in such a conclusory fashion, the ALJ failed to (1) identify the listed impairment for which Garcia's symptoms fail to qualify; (2) provide any explanation as to how he reached the conclusion that Garcia's symptoms are not severe enough to meet or medically equal any listed impairment; and (3) offer any reason for his finding.  In short, the ALJ offered nothing to support his conclusion at this step.  Thus, although the Court recognizes that it is sometimes difficult to detail a negative finding, absent any reason(s) for the ALJ's findings, the Court is unable to determine whether the ALJ based his determination on substantial evidence.  *See Audler*, 501 F.3d at 448.  Such failure was error.

### b. Whether Failure to Apply Proper Legal Standards Was Harmless Error

Although the Court finds that the ALJ failed to state the reason(s) for his conclusions, the Court must determine whether that failure, although error, was harmless.  *Id.* (citing *Morris v. Bower*, 864 F.2d 333, 334 (5th Cir. 1998)).  "Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).  However, where Plaintiff has shown prejudice, remand for further development of the record is appropriate.

### (i) ALJ Vanderhoof's Conclusion that Garcia's Impairment(s) Do Not Meet the Criteria of Listing 1.04 Was Harmless Error

For a claimant to show that his impairment(s) meets the requirements of a listing, *all* of the specified medical criteria in the applicable listing must be met.  20 C.F.R. § 404.1525(d);

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).   Meeting some of the criteria "no matter how severely, does not qualify."   *Sullivan*, 493 U.S. at 530 (citing SSR 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)).   As the claimant, Garcia bears the burden of demonstrating, through medical evidence, that his impairments meet all of the specified medical criteria contained in a particular listing.   *Id.*   Here, the applicable listing is found in § 1.04, which pertains to disorders of the spine.   Spinal disorders "result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots . . . or spinal cord."   *Id.* at § 1.00K.   Examples of spinal disorders in Listing 1.04 include "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [and] vertebral fracture."   As set out in the listing, spinal disorders result in the compromise of the nerve root or spinal cord and must include (1) evidence of nerve root compression; (2) spinal arachnoiditis; or (3) lumbar spinal stenosis.   20 C.F.R. pt. 404, subpt. P, App. 1, § 1.04.   The Court will now determine whether there is substantial evidence that Garcia's impairment(s) do not meet any of these Listings.

### (1)      Spinal Arachnoiditis (Listing 1.04B)

The Court will first analyze whether Garcia's impairment(s) meets the criteria of spinal arachnoiditis, since this is what Garcia specifically claims.   [*See* Dkt. No. 15 at 7].   To find disability under this listing, Garcia's impairment(s) must meet all of the criteria under 1.04B, which include (1) confirmation of spinal arachnoiditis by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging; (2) manifested by severe burning or painful dysesthesia; and (3) resulting in the need for changes in position or posture more than once every two hours.   *Id.*

Garcia asserts that "the medical evidence that was adduced *after* the State agency determination . . . strongly suggests that [his] condition meets or is equivalent to (in combination with his other impairments) Listing 1.04B."  [Dkt. No. 15 at 6-7].  Specifically, he points out that "[an] MRI conducted on December 3, 2004, demonstrates epidural fibrotic scarring at the level of the claimant's prior surgery" and at other levels along his spine.  [*Id.* at 7].  Garcia then cites to Listing 1.04B to draw a parallel between spinal arachnoiditis and his condition.  [*Id.*].  While Garcia's medical records provide evidence of epidural fibrotic scarring, nothing indicates a diagnosis of arachnoiditis.

Because arachnoiditis is not evident with a "discrete clinical picture of specific motor, sensory and reflex abnormalities, diagnosis tends to rest on tests such as MRI or CT scans." Sarah Andreae-Jones, *The Adhesive Arachnoiditis Syndrome*, A.S.A.M. Society, at 19 (2000), http://www.arachnoiditis.info/content/the_adhesive_arachnoiditis_syndrome/the_adhesive_arachnoiditis_syndrome_3.html (last visited Sept. 14, 2007); *see also* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.00C(1) (indicating that "medically acceptable imaging" as required by Listing 1.04B includes MRI).  As stated above, CT myelography has been found to be a more accurate diagnostic tool for arachnoiditis than an MRI scan.  *See supra* at n.10.  On July 10, 2003, Dr. Rapp evaluated a myelogram of Garcia's spine.  [Dkt. No. 13-4 at 6].  Dr. Rapp's report identified the presence of disc herniation, but did not mention or even allude to the possibility of arachnoiditis.  Garcia has also undergone a number of MRI studies, none of which indicated the presence of arachnoiditis.  Thus, given the large number of studies conducted on Garcia's spine—both MRI and myelography—if he did indeed suffer from arachnoiditis, either one of the studies would have revealed it, or one of the numerous physicians that examined him should have mentioned it in a report.

Garcia additionally claims that "the medical evidence also demonstrates that [he] consistently reported 'painful dysesthesia' as required by Listing 1.04B." [Dkt. No. 15 at 7]. Even though the subjective and medical evidence of Garcia's complaints are consistent with the description of "painful dysesthesia" symptoms in Listing 1.04B, those symptoms by themselves do not suffice for a confirmation of spinal arachnoiditis. Therefore, because there is no evidence of a confirmation of spinal arachnoiditis per any of the requirements of Listing 1.04B, the Court finds that the ALJ's conclusion that Garcia's impairment(s) do not meet the criteria of that listing is supported by substantial evidence.

### (2)      Compression of Nerve Root (Listing 1.04A)

To meet Listing 1.04A, Garcia must provide evidence that he suffers from a disorder of the spine resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression, characterized by (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and; (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). Because Garcia must establish the presence of all the criteria in § 1.04A, the Court will address what it has determined is not present—nerve root compression and positive straight-leg raising test, but in both the sitting and supine positions.

Garcia's medical records extensively indicate the presence of disc herniations, [see Dkt. Nos. 13-4 at 6, 9, 11, 14, 32, 33, 34, 38, 40; 13-5 at 9], but there is no evidence of actual nerve root compression, as required by Listing 1.04A. The closest indication of such a compression in the record is Dr. Harvey I. Wilmer's evaluation of a lumbar myelogram and CT of Garcia's lumbrosacral spine on June 19, 2003. [Dkt. No. 13-4 at 11]. Dr. Wilmer indicated that "[t]here is a left lateral possibly with some far lateral extension of a disc herniation on the right . . . [and]

*some pressure* on the right side of the subarachnoid space of the *right nerve root* . . . ."  [*Id.* (emphasis added)].  However, there is no indication of the extent of this pressure or even if it amounts to a "pinching."  While "[a]ny compromise of the nerve space in the spinal column can lead to compression of the nerve endings . . ." [Nerve Root Compression, *available at* http://www.spinaldisorders.com/spinal/ (follow "nerve compression" hyperlink under "Disorders"; then follow Nerve Root Compression under "Item Title")], pressure does not equate compression.

Whether Garcia's nerve root is compressed may be determined via an MRI scan, which is a very useful tool for determining nerve root compression "because this type of a scan is designed to show the details of soft-tissue structures, like nerves and discs."  Radiculopathy Symptoms, *available at* http://www.back.com/symptoms-radiculopathy.html.  While Garcia's radiculopathy could be the result of nerve compression, there is nothing in the record to confirm that the disc herniation has resulted in a pinched nerve.  Garcia has undergone numerous MRI studies, yet none of them have confirmed nerve root compression.

Additionally, while the record establishes findings of positive straight-leg raising test, there is no indication of whether the test was performed in both the sitting and supine position.  As such, the Court finds that substantial evidence supports the ALJ's conclusion that Garcia's impairment(s) does not meet Listing 1.04A.  Therefore, the ALJ's error as to this finding was harmless.

### (3)    Lumbar Spinal Stenosis (Listing 1.04C)

Listing 1.04(C) requires that lumbar spinal stenosis—a narrowing of the spinal canal which compresses the nerves traveling through the lower back into the legs—be established by findings on appropriate medically acceptable imaging.  20 C.F.R. Pt. 404, Subpt. P., App. 1,

§ 1.04(C); *see also* Lumbar Spinal Stenosis, *available at* http://www.neurosurgerytoday.org/what/patient_e/lumbar.asp (August 2005). Garcia's medical record provides no diagnosis of spinal stenosis. In fact, Dr. Eric Wilson of the McCallen Medical Center evaluated an October 23, 1991 MRI of Garcia, concluding that "[t]there is no spinal canal stenosis." [Dkt. No. 13-4 at 38]. Similarly, a report by Dr. Rapp on June 19, 2003, indicates that "[t]here is no disc space narrowing at L4/L5." [*Id.* at 11]. Thus, substantial evidence also supports the ALJ's finding that Garcia's impairment(s) does not meet Listing 1.04(C).

Because Garcia's impairment(s) does not meet any of the listings in 1.04, the ALJ's error in failing to provide reasons for his conclusions was harmless. The Court will now analyze whether his error in finding that Garcia's impairment(s) were not equivalent to any of the listings was also harmless.

### (ii) ALJ Vanderhoof's Conclusion that Garcia's Impairment(s) Did Not Equal the Listing Was Harmful Error

Even if a claimant's impairment(s) does not meet the criteria of a listing, it can still medically equal the criteria of a listing in a determination of disability. 20 C.F.R. § 404.1525. The listings in appendix 1 "are only examples of common musculoskeletal disorders that are severe enough to prevent a person from engaging in gainful activity." 20 C.F.R. pt. 404, subpt. P, App. 1. As such, medical equivalence is considered in any case where an individual has a medically determinable impairment(s) that is either not listed or fails to meet the requirements of a listing. *Id.* at §1.00H.

For a claimant to qualify for benefits by showing that his unlisted impairment(s) is equivalent to a listed impairment, he must present medical findings equal in severity and

duration to all the criteria for the most similar listed impairment.  20 C.F.R. §§ 404.1526(a), 416.926(a).  Medical findings must be presented as to each criteria and it is not enough to show that the overall functional impact of an unlisted impairment or combination of impairments is as severe as that of a listed impairment.  *Sullivan*, 493 U.S. at 531 (citing SSR 83-9, at 91-91).  A claimant may establish medical equivalence by having (1) a listed impairment that does not exhibit all of the required findings or severity and showing other findings related to the impairment that are "at least of equal medical significance;" (2) an impairment that is not listed but that is closely analogous and would otherwise satisfy the requirements; or (3) a combination of impairments with findings "at least of equal medical significance" to a closely analogous listing.  *See* 20 C.F.R. §§ 404.1526, 416.926.  In determining medical equivalence, all of the evidence in a claimant's case record that is relevant to his impairment and its effects must be considered.  20 C.F.R. § 416.926(b).

With these principles in mind the Court will now look at Garcia's medical records to determine whether Garcia's impairment(s) is equal in severity to any listing in § 1.04.  As stated above, the listed impairments in § 1.04 are spinal disorders resulting in compromise of a nerve root with (1) evidence of nerve root compression; (2) spinal arachnoiditis; or (3) lumbar spinal stenosis.  *Id.*

### (1)     Spinal Arachnoiditis (Listing 1.04B)

Because Garcia specifically claims that his impairment is equivalent to spinal arachnoiditis, the Court will again begin its analysis with Listing 1.04B.  To establish equivalence, Garcia must provide medical findings showing that his impairment(s) is "closely analogous" to each criteria of spinal arachnoiditis, s*ee* 20 C.F.R. §§ 404.1526, 416.926, which includes (1) confirmation of spinal arachnoiditis by an operative note or pathology report of

tissue biopsy, or by appropriate medically acceptable imaging; (2) manifested by severe burning or painful dysesthesia; and (3) resulting in the need for changes in position or posture more than once every two hours.  *Id.*

As previously noted, Garcia claims that the finding of epidural scarring is sufficient to determine that his condition equals spinal arachnoiditis.  In fact, arachnoiditis and epidural fibrosis are two different spinal conditions:

> Arachnoiditis is chronic inflammation inside the dura, in the arachnoid layer of the meninges . . . whereas epidural fibrosis is scarring outside the dural sac . . . .  Many doctors appear to regard epidural fibrosis as less clinically significant than arachnoiditis, but in essence the nerve root compression arising from epidural fibrosis may cause similar clinical problems in terms of lower limb pain, sensory disturbance and weakness.  Epidural fibrosis differs from arachnoiditis in that it is more likely to be a localised problem and is generally a post-surgical phenomenon . . . .  In cases of arachnoiditis, there is often associated epidural fibrosis, but the reverse is not generally acknowledged, so that patients may be left with a diagnosis of epidural fibrosis and are unable to get a diagnosis of arachnoiditis even when the clinical picture fits.

Andreae-Jones, *The Adhesive Arachnoiditis Syndrome*, A.S.A.M. Society, at 2 (2000), http://www.arachnoiditis.info/content/the_adhesive_arachnoiditis_syndrome/the_adhesive_arach noiditis_syndrome_3.html (last visited Sept. 14, 2007).  While the record provides confirmation of epidural fibrosis, there is no evidence of chronic inflammation inside the dura.  In fact, the record indicates a "deformity of the right anterior surface of the dural sac" at L4-L5.  [Dkt. No. 13-4 at 35, 36].  This indicates that the surface, rather than the interior of the dural sac, is compromised, and there is no indication that this deformity is a result of an inflammation (much less a chronic one).  The record also indicates that on June 19, 2003, Dr. Wilmer issued a report indicating the presence of "some pressure on the right side of the subarachnoid space of the right nerve root."  [*Id.* at 11].  However, nothing in Dr. Wilmer's report indicates that this pressure amounts to a chronic inflammation of the dura.

Listing 1.04B also requires that the impairment(s) be manifested by "painful dysesthesia." Listing 1.04B. The Commissioner argues that there is no evidentiary support for Garcia's claim that he experiences such pain. [Dkt. No. 17 at 6]. "Dysesthesia" is defined as an "impairment of sensation, especially that of touch" and as "a condition in which an unpleasant sensation is produced by ordinary stimuli." THE AMERICAN HERITAGE MEDICAL Dictionary (2007) *available at http://medical-dictionary.thefreedictionary.com/dysesthesia*. Dysesthesia is also defined as an unpleasant abnormal sensation—such as burning, tingling, or numbness— whether spontaneous or evoked. *See* www.answers.com/topic/dyssesthesia?cat=health (last visited, March 5, 2008).

Throughout the record there is evidence that Garcia has complained of burning, tingling, and numbness, but certain inconsistencies in the record shed doubt on the presence of something equivalent to painful dysesthesia. On different occasions, Dr. Tijerina noted that Garcia complained of numbness and a tingling sensation towards the right buttock behind the thigh, knee, and sole of the foot, [Dkt. No. 13-4 at 21, 26], pain associated with numbness, [*id.* at 23], and numbness to both lower extremities, [*id.* at 28]. Similarly, the Oakwood Hospital and Medical Center Emergency Physician Record dated June 14, 2003 indicates that Garcia reported sharp lower back pain accompanied by numbness in the back side of both legs. [*Id.* at 5]. However, on June 17, 2003, Dr. Rapp issued a report in which he stated that "[p]inprick, light touch and proprioception tested on both upper and lower extremities proximally and distally showed no abnormalities." [*Id.* at 8]. A normal assessment on a sensory examination of this kind seems to conflict with painful dysesthesia, given that there appears to be no impairment of sensation, or the presence of an unpleasant sensation produced by ordinary stimuli. Finally, in an examination report dated October 20, 2004, Dr. Friedman indicated that Garcia "continues to

have stabbing low back pain with *burning* in the buttock and some numbness of the right low extremity." [Dkt. No. 13-5 at 8 (emphasis added)]. However, in the Oakwood Hospital's patient health profile dated June 14, 2003, Garcia rated his pain as an 8 out of 10 (with 10 being the worst), and while he checked the "sharp" box to identify the quality of his lower back pain, he did not check the "burning" pain box. [Dkt. No. 13-4 at 3]. Given these inconsistencies, the Court agrees with the Commissioner that there is insufficient evidence of painful dysesthesia or something equivalent to it in severity and duration.

Finally, to meet Listing 1.04B, Garcia would have to demonstrate the need to change his position or posture more than once every two hours. The record indicates that Garcia did in fact need to change his position every 30 minutes while standing, every 20 to 30 minutes while sitting, and every 15 to 20 minutes to an hour when lying down. [Dkt. No. 13-5 at 29-31, 33, 37]. However, this finding by itself is insufficient for a finding of equivalence.

Thus, because the available medical evidence in the record fails to establish the presence of chronic inflammation inside the dura or painful dysesthesia, the Court finds that Garcia's condition is not equivalent to spinal arachnoiditis.

### (2)    Compromise of Nerve Root (Listing 1.04A)

To demonstrate equivalence with regards to Listing 1.04A, Garcia must show through medical evidence that his impairment(s), while not listed, is closely analogous to Listing 1.04 and 1.04A—that is, a spinal disorder resulting in compromise of a nerve root with evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and; (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). § 1.04A. Garcia's impairment(s) do

not meet Listing 1.04A because there is no clear evidence in the medical record of a spinal disorder demonstrating the presence of nerve root compression and the record does not establish that the straight-leg raising test is positive both sitting and supine.  However, the issue now becomes whether Garcia can demonstrate that while his impairment is not listed in appendix 1, that it is closely analogous and would otherwise satisfy the requirements of Listing 1.04A.  If so, a finding of equivalence will ensue.

The Court will begin with discussion of criteria established by the record.  Neuro-anatomic pain distribution is otherwise known as "radicular" pain or "radiculopathy," a deep and steady pain that can usually be reproduced with certain activities and positions, such as sitting or walking.   Low Back Pain and Sciatica: Radicular Pain, *available at* http://www.spine-health.com.  A disc's weak spot is located directly under the nerve root, "and a herniated disc in this area puts direct pressure on the nerve, which in turn can cause pain to radiate all the way down the patient's leg to the foot."  Lumbar Herniated Disc, *available at* http://www.spine-health.com (last visited March 5, 2008).  *Id.*  Radicular pain radiates into the lower extremity directly along the course of a specific spinal nerve root, and may be accompanied by numbness and tingling, muscle weakness and loss of specific reflexes.  *Id.*  Radiculopathy is caused by compression, inflammation, and/or injury to a spinal nerve root in the low back.[21]  *Id.*

Garcia's medical record provides ample evidence of radiculopathy.  Dr. Tijerina's reports and evaluations, beginning in January of 2003 until August of 2005, indicate that Garcia's low back pain radiates to his lower right extremities down to the sole of his foot and is accompanied by cramping, numbness and a tingling sensation to the right buttock behind the thigh, knee, and sole of foot.  [*See* Dkt. No. 13-4 at 23-28; *see also* Dr. Alfonso's reports at 35-37].  The reports also indicate that Garcia's pain worsens with coughing, sneezing, prolonged

---

[21] The most common cause of radiculopathy is a herniated disc with nerve compression.

walking, sitting, and standing, and overall worsens over time.  [*Id.*; *see also id.* at 38 (McCallen Neurological Center, P.A.'s workers compensation follow-up visit report)].    Similarly, the Oakwood Hospital and Medical Center's Emergency Physician Record dated June 14, 2003 indicates that Garcia's chief complaint is a sharp, moderate, lower back pain accompanied by numbness in the legs.  [*Id.* at 5].  A subsequent report by Dr. Rapp dated June 17, 2003 also noted that Garcia admits to suffering from radiating pain and numbness.  [*Id.* at 7].  Garcia's physical residual functional capacity assessment dated December 10, 2003 also provides evidence of radicular pain.  [*Id.* at 14].  Similarly, an October 20, 2004 report issued by Dr. Friedman indicates that after Garcia's work-related injury in 1991, "he experienced some back discomfort over the next day," and that his symptoms later intensified, subsequently "experiencing severe pain radiating down the right lower extremity."  [*Id.* at 7].    Finally, an EMG examination of Garcia's back on January 6, 2005 revealed "evidence of acute right S1 radiculopathy and chronic reinnervation on muscles supplied by the right L5 nerve root."  [Dkt. No. 13-4 at 39; *see also* Dkt. No. 13-5 at 1].

To arrive at a finding of equivalence, Garcia's impairment(s) must also be characterized by "limitations of motion of spine."  Listing 1.04A.  On June 17, 2003, Dr. Rapp reported that Garcia "demonstrates decreased range of motion of the lumber spine to flexion and extension." [Dkt. No. 13-4 at 8].    Additionally, a physical examination of Garcia by Dr. Friedman on October 20, 2004 revealed that his "back movements are limited." [Dkt. No. 13-5 at 9]. Similarly, Dr. Tijerina's evaluations of Garcia over the course of several years indicate a decrease in motion range distribution in the right side of his back.  [*See* Dkt. No. 13-4 at 21-26]. For example, on June 2, 2005, Dr. Tijerina noted that Garcia "[b]ends at 60 degrees with low back pain and right hip pain."  [*Id.* at 23].  Thus, the Court is satisfied that the medical evidence

in the record reveals that Garcia's motion of the spine is limited.

Third, Garcia's condition must be accompanied by "motor loss (atrophy with associated muscle weakness or muscle weakness)" along with sensory or reflex loss.  Listing 1.04A.  The medical record also provides evidence that Garcia's impairment(s) includes motor, sensory, and reflex loss.  Dr. Friedman's report indicates that on formal muscle testing, Garcia appeared to have "some weakness of plantarflexion" on the left foot.  [Dkt. No. 13-5 at 9].  Similarly, Dr. Rapp's examination in June 2003 indicates that "manual muscle testing showed strength to be decreased in the left foot to dorsiflection."  [Dkt. No. 13-4 at 8].   The SSA's physical residual functional capacity assessment on December 10, 2003 states that there is a decrease in flexion and extension as well as in the muscle strength of his left foot to dorsiflexion.  [*Id.* at 15]. Additionally, Dr. Tijerina's report for the Texas Workers' Compensation Commission on September 10, 2003 reveals that Garcia's "sensory was decreased on right L5, and L5 and S1 . . . motor shows left drop foot . . . [and] deep tendon reflexes were equal but decreased all over." [*Id.* at 29].  Finally, Dr. Tijerina's reports over time also indicate a decrease in deep and overall tendon reflexes and an inability to walk on tiptoes and heels.  [*See id.* at 23-27].

Finally, because Garcia's impairment(s) involves the lower back, the straight-leg raising test—sitting and supine—must be positive.  Listing 1.04A.  Dr. Rapp's June 17, 2003 report clearly states that Garcia "demonstrates positive straight leg raising on the right that reproduces his right leg pain."  [Dkt. No. 13-4 at 9].  Similarly, Dr. Tijerina's June 2, 2005 clinical findings indicate that a [p]hysical examination of [Garcia's] lumbar spine shows straight leg raise on the right side at 70 degrees with low back pain and leg pain . . . ."  [*Id.* at 23; *see also id.* at 24-29 (demonstrating similar results with a variance in degrees)].   Finally, Dr. Friedman's report demonstrates that the physical examination revealed that [w]ith straight leg raising on the right

leg, [Garcia] also complained of back and buttock discomfort; on the left he described only some mild pain around the knee." [Dkt. No. 13-5 at 9].

While the record provides evidence of numerous positive straight-leg raising tests, there is no information regarding whether they were performed in both the sitting and supine positions, as required by the listing. This deficiency in the record would suffice to establish that Garcia's impairment(s) do not meet Listing 1.04A. However, because the medical evidence detailed above otherwise shows support for the other criteria in the listing, the Court believes that this raises a fundamental question about equivalence.

The closest evidence of actual compromise to the nerve root is Dr. Wilmer's indication that there is "some pressure on the right side of the subarachnoid space of the nerve root." [Dkt. No. 13-4 at 11]. While the Commissioner addressed the impact of this finding on spinal arachnoiditis, he failed to discuss its bearing on Listing 1.04A. In fact, the Commissioner introduced no medical evidence to contradict the evidence in the record with regards to this finding. While Garcia concentrates on Listing 1.04B, the ALJ rendered his opinion with regards to all impairments in appendix 1 and therefore should have addressed them accordingly. [*See* Dkt. No. 13-1 at 19]. The Court believes that Dr. Wilmer's report, combined with the detailed findings above, suggest that Garcia's impairment(s) is potentially equivalent to Listing 1.04A.

A thorough review of the record establishes a conspicuous absence of a credible choice (that Garcia's condition does not equal) and, as to the findings detailed above, no contrary medical evidence. Nevertheless, the issue here is that the ALJ erred in failing to provide an explanation as to his findings and by neglecting to set out the bases for his decision at step three. Furthermore, because the evidence shows that Garcia's substantial rights were affected, the Court finds that the ALJ's error was not harmless.

### (3)    Lumbar Spinal Stenosis (Listing 1.04C)

Although not necessary, in the interest of thoroughness, the Court will analyze whether Garcia's impairment(s) are equivalent to Listing 1.04C.  To demonstrate that his impairment(s) is equivalent to Listing 1.04C, Garcia must provide evidence that his impairment(s) is analogous to a spinal disorder resulting in compromise of a nerve root and would otherwise satisfy the requirements of the listing, which include (1) evidence of lumbar spinal stenosis resulting in pseudoclaudication; (2) established by findings on appropriate medically acceptable imaging; (3) manifested by chronic nonradicular pain and weakness; and (4) resulting in inability to ambulate effectively, as defined in 1.00B(2)(b).  Listing 1.04C.  As previously noted, the medical record indicates that Garcia does not suffer from spinal stenosis.  [Dkt. No. 13-4 at 38].  Thus, because Garcia's impairment(s) is not listed in § 1.04C, a finding of equivalence would require his impairment(s) to be closely analogous to and satisfy the requirements of the listing.

Pseudoclaudication, the first criteria in Listing 1.04C, results from the narrowing of the lumbar spinal canal, which puts pressure on the spinal root nerves, manifests itself as pain and weakness, and may impair ambulation.   Listing 1.00I(3); Jerry Swanson, M.D., *Pseudoclaudication v. Claudication: What's the Difference?*, *available at* http://www.mayoclinic.com/health/pseudoclaudication/HQ01278 (last visited, March 6, 2008). The medical record indicates that there is no spinal canal stenosis, and that Garcia's spinal canal is normal in diameter.  [*See* Dkt. No. 13-4 at 35, 37].  This listing also requires that the impairment(s) be manifested by nonradicular pain and weakness and that the impairment result in an inability to ambulate effectively.  Listing 1.04C.  An inability to ambulate effectively means "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."

Listing 1.00A(2)(b)(1).  On June 17, 2003, Dr. Rapp issued a report on Garcia's condition and noted that "[t]he patient's ambulation is normal" and is "able to ambulate on heels and toes." [Dkt. No. 13-4 at 9].   After considering this evidence, the Court concludes that Garcia's impairment(s) is not equivalent to Listing 1.04C.  Therefore, the ALJ's error was harmless as to this Listing.

### c.       ALJ Vanderhoof Was Required to Obtain an Updated Medical Opinion

Garcia claims that the ALJ erred in failing to obtain an updated medical expert opinion. Medical equivalence is based upon medical evidence only; that is, upon medical opinions, or medical findings supported by medically acceptable clinical and laboratory diagnostic techniques.    20 C.F.R. §§ 404.1526(b), 416.926(b).    Nevertheless, the responsibility for determining medical equivalence rests on the ALJ.  20 C.F.R. §§ 404.1526(d), 416.926(d); SSR 96-6p.  However, "longstanding policy requires that the judgment of a physician designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight."  *Id.*  Therefore, when symptoms, signs, and laboratory findings suggest medical equivalence, or when additional medical evidence is received which may change the state agency consultant's finding of "no medical equivalence," the ALJ must call a medical expert to testify regarding medical equivalence.  *Id.* at 132.  When an ALJ finds that an individual's impairment(s) is not equivalent in severity to any listing, "the requirement to receive expert opinion evidence into the record may be satisfied" through a state agency medical consultant's signature on an SSA-831-U5 (Disability Determination and Transmittal Form).  *Id.*   [*See* Dkt. No. 13 at 26].  This ensures that a Commissioner-designated physician has given consideration to the question of medical equivalence at the initial and reconsideration levels of administrative review.  SSR 96-6p.

In determining whether the ALJ was required to obtain an updated medical opinion, the Court will first analyze the issue of "new evidence," since this is the argument on which Garcia hangs his hat.  The Commissioner argues that the ALJ was not required to obtain an updated medical opinion from a medical expert because "the ALJ had access to ample medical records and professional evaluations," making it reasonable for him to "forgo consultation of a medical expert at the hearing."  [Dkt. No. 17 at 4].  The Commissioner also avers that "much of the evidence [Garcia] claims shows that he meets Listing 1.04B was created *prior* to the December 11, 2003 state agency medical consultant's opinion."  [*Id.* at 5].  As such, he argues that the medical expert would have considered these records by the time he found that Garcia did not meet a listing.  [*Id.*].  Conversely, Garcia claims that there was medical evidence adduced after the state agency determination that "strongly suggests" that Garcia's condition "meets or is equivalent to" Listing 1.04B.  [Dkt. No. 15 at 6-7].  The new evidence that Garcia refers to is an MRI conducted on December 3, 2004, which demonstrates "epidural fibrotic scarring at the level of the claimant's prior surgery . . . more prominent in the central and right lateral aspect . . . [a]t L5-S1 . . . ."  [*Id.* at 7].

The Court agrees with the Commissioner's argument, but only insofar as it relates to Listing 1.04B.  It is the opinion of this Court that the new medical evidence that Garcia invokes is not new at all because it presents diagnoses consistent with a number of Garcia's previous medical evaluations.  Garcia's medical records indicate that several diagnostic imaging studies revealed evidence of fibrosis in January 1993, March 1994, January 1995, January 1999, and December 2004, all of which the ALJ considered in making his determination.  *See supra* at 7-8, 11.  Therefore, the Court finds that no additional medical evidence was received which could change the state agency consultant's finding of no medical equivalence as to Listing 1.04B.

However, the medical record includes numerous reports from physicians created *after* the December 11, 2003 state agency medical consultant's opinion which, in combination with evidence adduced before that date, reveal "symptoms, sings, and laboratory findings" that suggest medical equivalence as to Listing 1.04A. *See supra* at 32-33. Additionally, while the ALJ may have considered this evidence in making his determination, the Court believes that this evidence may have changed the state agency consultant's finding of "no medical equivalence." Thus, because this evidence suggests medical equivalence, the ALJ should have called a medical expert to testify.

Nevertheless, because the ALJ found that Garcia's impairment(s) is not equivalent in severity to any listing, he should have satisfied the requirement to receive expert opinion into the record through a state agency medical consultant's signature on an SSA-831-U5 form. However, the Court is unable to locate a SSA-831-U5 form that would otherwise satisfy the requirement to receive expert opinion evidence into the record. *See* SSR 96-6p. The closest thing available in the record is form SSA-831-C3, also entitled "Disability Determination and Trasmittal," signed by a Dr. Barker, who appears to be the state agency medical consultant. [Dkt. No. 13 at 26]. However, this form provides no information about what evidence was considered or what determination was made as to equivalence.

The Commissioner claims that Dr. Barker "reviewed Plaintiff's claim at the initial level and determined that Plaintiff's degenerative back disorders did not meet or equal a listed impairment" and that her opinion "constitutes substantial evidence to support the ALJ's findings." [Dkt. No. 17 at 5]. The only document in the record resembling an opinion with Dr. Barker's signature on it is a cryptic form dated December 11, 2003, which provides no information as to her rationale, evaluation procedure, or findings. [See Dkt. No 13-1 at 26]. In

fact, the closest thing in the form to an opinion is section 19, in which Dr. Barker checked Box "A" which indicates that claimant is not disabled "[t]hrough date of current determination." [*Id.*].  Similarly, section 27 provides an opportunity for the examiner to provide her rationale by checking one of two boxes: (1) "See Attached SSA-4288-U4/C4", and (2) "Check if Vocational Rule Met. Cite Rule ___."  [*Id.*].  However, neither box is checked off.  Additionally, in section 34, entitled "Remarks," Dr. Barker noted the following: "Disability Redesign Prototype Case," and then provided a cross reference to the Physical Residual Functional Capacity Assessment form dated December 10, 2003.  [*Id.*; *see* Dkt. No. 13-4 at 13].  This cross reference is limited because residual functional capacity is relevant only to step four of the analysis, referring to the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks.[22]  *See* 20 C.F.R. § 404.1545(a); SSR 96-8p.

The Court acknowledges that while the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has the sole responsibility for determining a claimant's disability status."  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).  In fact, "[t]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Id.*  However, in this case there was no evidence supporting a contrary conclusion.  The Commissioner provides no evidence that competing first-hand medical evidence led the ALJ to find as a factual matter that one doctor's opinion was more well-founded than another.  *See and compare, e.g.*, *Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993).  Similarly, there is no indication that the ALJ weighed the state agency medical examiner's opinion on disability against the medical opinion of the physicians who have treated

---

[22] In any event, with regards to step four, the ALJ found that Garcia is unable to perform any of his past relevant work, [Dkt. No. 13-1 at 23], which is corroborated by Dr. Friedman's evaluation dated October 20, 2004 in which he concluded that "Mr. Garcia is totally and permanently disabled from working as a laborer in the construction trade for the remainder of his life," [Dkt. No. 13-5 at 9].  As such, this cross reference is irrelevant at this stage.

or examined Garcia and who provided specific medical bases for a contrary opinion. *See and compare, e.g.*, *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000). Moreover, there is no evidence in the record to establish whether Dr. Barker is a specialty medical expert or whether she personally examined Garcia; yet the ALJ purportedly relied on her opinion to make his decision as to step three. As such, the Court is not satisfied that a Commissioner-designated physician gave adequate consideration to the question of medical equivalence.

For the reasons stated above, the Court finds that the ALJ should have obtained an updated medical opinion and failed to do so.

### 6. *ALJ Vanderhoof's Conclusion that Garcia is Able to Perform Other Work*

Because a conclusive finding at any step makes it unnecessary to proceed to the subsequent steps, § 404.1520(a)(4), the Court need not proceed to analyze the subsequent steps. Having determined that the ALJ's error in step three was not harmless, the Court will nevertheless briefly discuss the ALJ's analysis in step five, in which the ALJ determined that Garcia was able to perform other work in the national economy, thereby denying his claim. [Dkt. No. 13-1 at 23-24]. Under the Social Security Regulations, the ALJ may use the services of a vocational expert or other specialist in determining whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used . . . ." 20 C.F.R. § 404.1566(e); *see Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1169, 1170 (5th Cir. 1986).

The ALJ accepted the testimony of the vocational expert present at the hearing, who found a significant number of jobs in the national and local economies that Garcia could

perform.  The vocational expert evaluated Garcia's residual functional capacity, age, education and work experience in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations.  The vocational expert noted that Garcia was 34 years old at the time of the hearing (making him a "younger individual" under the Regulations, 20 C.F.R. § 404.1563), that he has a high school equivalent education, and no transferable skills.  [Dkt. No. 13 at 21].  In evaluating Garcia's work experience, the vocational expert stated that nearly all of the jobs that Garcia performed in the past are rated as medium or heavy or very heavy.  [Dkt. No. 13-6 at 5].  The Dictionary of Occupational Titles indicates that the meat packing job is rated as an unskilled job light in its physical demands.  [Dkt. No. 13-6 at 5].

The ALJ considered Garcia's exertional limitations in light of the Medical-Vocational Guidelines and determined that Garcia "is capable of performing a significant range of light work as defined in 20 C.F.R. § 404.1567.  The ALJ then asked the vocational expert what, if any, jobs exist in the national economy for an individual of Garcia's age, education, past relevant work experience and residual functional capacity.  [Dkt. No. 13 at 22].  The vocational expert testified that Garcia would be able to make a vocational adjustment to other work.  [*Id.*].  Particularly he testified that Garcia could work as a small parts assembler, cashier, bench assembler, and call-out telephone operator.  [*Id.*].  He also found that there are a number of jobs available in the national economy for each one of these positions.  [*Id.*].  Although the ALJ appears to have used step five to trump step three, the ALJ did not err in basing his conclusion on the vocational expert's testimony, even if any of these jobs are not immediately available for Garcia or if it is uncertain whether he could obtain one if he applied.

### III.    CONCLUSION

The Fifth Circuit imposes a duty on an ALJ "to develop the facts fully and fairly relating to an applicant's claim for disability benefits."  *Ripley*, 67 F.3d at 557.  "If the ALJ does not satisfy his duty, his decision is not substantially justified."  *Id.*  When the ALJ fails in this duty, remand is appropriate if the claimant was prejudiced by an inadequately developed record. *Gullett v. Chater*, 973 F. Supp. 614, 622 (E.D. Tex. 1997) (citing *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994)).

The ALJ appears to have assumed the absence of equivalence without any relevant discussion in his decision.  Such an assumption simply cannot substitute for evidence and does not support the decision to deny benefits.  As such, the Court finds that the ALJ did not meet his duty.   Furthermore, the Court finds that the ALJ's final decision finding that Garcia's impairment(s) was not severe enough to equal one of the listings in appendix 1 is not supported by substantial evidence.  In fact, the Court considers that there is substantial evidence in the record to the contrary.  Thus, having reviewed the pleadings, the ALJ's decision, the objective medical facts, and the diagnoses and opinions of the examining physicians, the Court finds that the ALJ erred in failing to apply the proper legal standards, and because this error was prejudicial to Garcia, it was not harmless.  As such, the ALJ's decision denying Garcia's disability benefits should not stand.

Accordingly, Garcia's motion for judgment as to his request for a new hearing is GRANTED, Garcia's motion for judgment as to his request for benefits is DENIED, the Commissioner's cross summary judgment motion is DENIED, the Commissioner's decision is VACATED, and the cause is REMANDED for further consideration, consistent with this opinion.

In particular, this matter is hereby REMANDED to the ALJ with instructions to obtain an updated medical opinion and to provide an adequate explanation in his decision with regards to whether Garcia's impairment(s) are equivalent to Listing 1.04, and in particular 1.04A.

IT IS SO ORDERED.

DONE this 13th day of March, 2008, in Laredo, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE


**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**